AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Oregon

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The Cellular Telephone Assigned Call Number 619-227-6804

FILED 12 AUG '19 10:34 USDC-ORP

Case No. '19-MC-673

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereto.

located in the ______ District of Oregon, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Conspiracy to distribute the controlled substance, distribution and possession with the intent to distribute a controlled substance, and use of a communication facility to commit the offenses. |

The application is based on these facts:

See affidavit of HSI Special Agent Clinton Lindsly, which is attached hereto and incorporated herein by this reference.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of ____ days *(give exact ending date if more than 30 days:* 12/31/2019 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

By Telephone

Clinton Lindsly, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at 9:50 pm *(specify reliable electronic means)*.

Date: 08/11/2019

*Judge's signature*

City and state: Portland, Oregon

Hon. John Jelderks, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number 619-227-6804, with an unknown International Mobile Equipment Identity ("IMEI") number (hereinafter "**Target Cell Phone**"), whose wireless service provider is T-Mobile a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2. Information about the location of the **Target Cell Phone** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

JJ 8/11/19

**ATTACHMENT B**

**Particular Things to Be Seized**

**I. Information to be Disclosed by T-Mobile (hereinafter "Provider")**

A. All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days from the date on which data is first acquired under this search warrant, during all times of day and night, and the status of the device and the account associated with the device (i.e., whether the device is active or operational and whether the account is in good standing, canceled, suspended, etc.). "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar un-named records held by the Provider)] and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

B. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile (hereinafter "Provider"), Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on Provider's network or

JJ 8/11/19

with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

C. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 involving SANDOVAL.

JJ 8/11/19

DISTRICT OF OREGON, ss: AFFIDAVIT OF CLINTON LINDSLY

**Affidavit in Support of an Application for a Search Warrant for Geolocation Data & Pen Register and Trap and Trace**

I, Clinton Lindsly, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I have been employed as a Special Agent (SA) by Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), since August of 2010. I am currently assigned to the ICE/HSI Office of the Assistant Special Agent in Charge, in Portland, Oregon narcotics unit. Previously, I was assigned to the ICE/HSI Office in Los Angeles, California, where I worked for over six years in a money laundering and narcotics group that specialized in undercover operations. My formal law enforcement training includes successfully completing the 23-week HSI basic training course at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Since then, I have participated in dozens of drug investigations which utilized wiretaps, controlled purchase operations, physical surveillance, trash searches, electronic vehicle tracking, pole cameras, cars with hidden compartments used to transport drugs, buy / walks, buy / busts, cell phone geo-location techniques, cell-site simulators, undercover operations including narcotics and money laundering, informants, search warrants, interviews, arrests, and/or pen register/trap and trace orders. I have interviewed and managed informants in drug cases, prepared and executed search warrants, arrested and interviewed suspects, conducted physical

surveillance, and operated/utilized electronic and video surveillance during my drug investigations. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking. In 2011, I was cross-designated with United States Code Title 21 Authority by the U.S. Drug Enforcement Administration to investigate narcotics cases. My most recent Title 21 authority update was on September 14, 2018.

3. I have participated in many aspects of drug investigations. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar as to the manner in which narcotics traffickers transport and distribute narcotics in areas they control. I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement. Additionally, I have also been involved in investigations involving wiretaps as part of federal investigations into narcotics trafficking.

4. I also know that drug traffickers often communicate with their drug-trafficking associates using cellular telephones. I have become aware that more sophisticated drug trafficking networks, in addition to using oral communications over cellar telephones, now utilize electronic communications such as email, WhatsApp, Blackberry devices or other smart phone devices, Voice over Internet Protocol, video chat, internet messaging services, and social networking sites to communicate with one another such as Facebook, Twitter, and Instagram. During drug-related communications, traffickers often use coded or cryptic language to disguise the drug-related nature of their conversations.

5. Based on my training and experience, I know that in many narcotic trafficking organizations, different factions of the organization are compartmentalized to protect the

organization as a whole. I know that the organizations' recruiters, transporters, distributors, customers, and money launderers often do not know each other. Limiting the access and knowledge of each participant serves to protect the organization if and when a participant is identified by law enforcement. I also know that narcotics distribution organizations compartmentalize the information available to any one member of the organization so that even if an arrested subject was fully forthcoming, interviews would only yield limited information as to the interviewee's limited knowledge of the organization.

6. I submit this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the following cellular telephones as described in Attachment A: **Target Cell Phone (TC)**: 619-227-6804. **TC** is used by Yenira Gisela SANDOVAL Garcia aka "Jenny," an interstate drug transporter, and is a cell phone with service provided by T-Mobile with an unknown subscriber record.

7. As explained below, I believe there is probable cause to obtain the location information of the **Target Cell Phone** as described in Attachment B hereto.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience. Where I have identified an individual by name I have done so where I have a high degree of certainty as to the identity of

the caller based upon intercepted wire communications and observations from surveillance.

9. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, have been committed, are being committed, and will be committed by SANDOVAL and other co-conspirators both known and unknown who are yet to be identified, namely engagement in a conspiracy to distribute and possess with the intent to distribute a controlled substance, the distribution and possession with the intent to distribute a controlled substance, and the use of a communication facility to facilitate these felony drug offenses. There is also probable cause to believe that the location information of the **Target Cell Phone** described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

**Applicable Law**

10. Title 21 U.S.C. § 841(a)(1), provides that it is a violation of federal law to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance, such as methamphetamine.

11. Title 21 U.S.C. § 843(b), provides that it is a violation of federal law to knowingly or intentionally use any communication facility in committing or in causing or facilitating the commission of a felony drug offense in violation of 21 U.S.C. §§ 841(a)(1) and 846.

12. Title 21 U.S.C. § 846, provides that any person who attempts or conspires to commit any offense, such as those outlined in 21 U.S.C. § 841(a)(1), shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**SUMMARY OF INVESTIGATION AND USE OF COURT AUTHORIZED WIRETAPS**

13. Since April 2019, Investigators have been utilizing Court authorized federal wiretaps on members of a Drug Trafficking Organization (DTO) responsible for distributing large amounts of controlled substances including methamphetamine, heroin, and cocaine in the greater Portland, Oregon metropolitan area. These Court authorized wiretaps have included tapping phones used by Faustino MONROY Diaz, the leader of the DTO; Edgar Omar QUIROZ Rodriguez, the Portland cell leader; Jesus GONZALEZ Vazquez, a professional money launderer for the DTO; and several other members. In conjunction with these wiretaps, Investigators have also utilized numerous investigative techniques including physical surveillance, electronic monitoring such as GPS location data from cell phones and GPS tracking devices, pole cameras, trash searches, search warrants, interviews, and undercover purchases of drugs from the DTO.

14. The investigation has revealed an individual known to us as MONROY, who is the leader of the MONROY DTO, is responsible for distributing large quantities of heroin, methamphetamine, and cocaine to other dealers for the purpose of further distribution. The Portland cell leader is QUIROZ, who controls drug couriers, such as Gerson Fernando Martinez CRUZ also known as (aka) "Shaggy," Yunuhen SALAZAR Andrade aka "Morena," aka "Homegirl," Manuel De Jesus Sanchez CORADO aka "Chaparrito," aka "Little Man," Christopher GALLEGOS aka "Lucky," Lindsay Anne MARKS aka "Guera," and others, within the greater Portland, Oregon metropolitan area. Customers call or text MONROY, who in turn reaches out to QUIROZ. QUIROZ then dispatches CRUZ, SALAZAR, CORADO, GALLEGOS, MARKS, and others to retrieve the drugs from local stash houses (locations used to store and process drugs) and then deliver the drugs to the customers. Some of these drug customers are provided housing and act as "sub distributors" for the MONROY DTO such as

Rick DALHOVER, an unidentified male only known as "ROJO," an unidentified male only known as "VERDE," and an unidentified female only known as "TERE." Once the drugs are sold, the same couriers then deliver the cash collected from the sale of the drugs to GONZALEZ, at GONZALEZ BROS, a store and money remitter located in Portland, OR. GONZALEZ then communicates with MONROY, QUIROZ, or others to coordinate the wire transfer of the cash collected from the sale of drugs to Mexico and elsewhere. The delivery of the drug cash happens almost on a daily basis to the GONZALEZ BROS. When GONZALEZ is not at GONZALEZ BROS, GONZALEZ coordinates the cash deliveries and wire transfers with his "brother," only known as "Juan." Recently, GONZALEZ has begun to take a more active role in securing drugs for the MONROY DTO and has expanded his money laundering activities to other drug factions.

15. To avoid large losses of drugs if detected by law enforcement, the MONROY DTO maintains a low inventory of drugs, which is stored by the drug couriers, such as CRUZ, SALAZAR, CORADO, GALLEGOS, MARKS, or other drug couriers, or with the sub-distributors, such as DALHOVER, ROJO, VERDE, or TERE. The MONROY DTO also routinely changes drug stash locations, rotates vehicles, rotates phones, and pays drug couriers to take time off if they are getting "hot," or detected by law enforcement. Wiretaps have revealed that the MONROY DTO is provided drugs by various sources of supply including: Felipe de Jesus SARCO Gomez aka "Burro," who provided heroin and was arrested with two kilograms of heroin on May 6, 2019, pursuant to this investigation; an unidentified male only known as "MICHOCANO," who provides heroin and methamphetamine; Francisco Javier SOTO Hernandez aka "Chico," who provides cocaine; Cristian Hanguin FERNANDEZ aka "Barbas,"

who provides methamphetamine; an unidentified male only known as "POLI," who provides methamphetamine; and, others.

16. Wiretap calls have confirmed that MONROY secures large quantities of drugs from various drug sources in Mexico and then uses various interstate drug couriers to transport the drugs from Mexico to the District of Oregon, such as Yenira Gisela SANDOVAL Garcia aka "Jenny," or JAMINE. After securing the drugs in Mexico, the interstate drug couriers are paid approximately $2,000 per kilogram to transport the drugs from Mexico and/or California to the District of Oregon. Once arriving in Oregon, the interstate drug couriers then call QUIROZ to coordinate the delivery of the cache of drugs. When this supply chain is interrupted by law enforcement, MONROY and QUIROZ will reach out to the local sources of supply, such as MICHOCANO, SOTO, FERNANDEZ, and others to obtain daily supplies of drugs to sell. These calls have also revealed that MONROY is in substantial drug debt. Specifically, during a recorded call on July 16, 2019, Unidentified Male 2657 (UM2657), aka "Samuel Diaz," told GONZALEZ that MONROY owed him approximately $800,000 for "material," or coded jargon for drugs, and owed POLI approximately $400,000 for "water," or coded jargon for methamphetamine, totaling $1,200,000. Because of this, drug sources are reluctant to provide the MONROY DTO drugs on "credit."

17. The MONROY DTO has a large customer base who are buying methamphetamine and heroin for purposes of further distribution. Based on recent wiretap calls, Investigators estimate that the MONROY DTO is responsible for distributing approximately five kilograms of methamphetamine and five kilograms of heroin per day. Often times, these drugs are "fronted" on credit and the drug customers pay after selling the drugs. Investigators estimate that their daily gross sales of narcotics to be approximately $100,000 -

$175,000, which is then delivered to Jesus GONZALEZ at GONZALEZ BROS. At this time, the MONROY DTO is not selling cocaine as they have been unable to secure a drug source of supply.

**Court Authorized Wiretaps Identify Target Cell Phone Used for Drug Trafficking**

18. On June 28, 2019, United States District Judge of Oregon, Honorable Michael H. Simon, signed an order (19-MC-243-D) authorizing the continued lawful intercepts, including voice and electronic communications, of two phones used by Jesus GONZALEZ including TT15 and TT16. The interceptions of Jesus GONZALEZ allowed Investigators to intercept conversations about the delivery of drug cash to Jesus GONZALEZ at GONZALEZ BROS on an almost daily basis. Specifically, Investigators intercepted MONROY, QUIROZ, and others discussing the laundering of drug cash to Mexico with Jesus GONZALEZ. During this authorization period, it also appeared that Jesus GONZALEZ was taking a more active role in the drug trafficking activities of the MONROY DTO including securing crystal methamphetamine, heroin, and cocaine for the MONROY DTO. On several occasions, Jesus GONZALEZ acted as a "broker," connecting various drug sources with the MONROY DTO to secure drugs.

19. On July 31, 2019, May 31, 2019, United States District Judge of Oregon, Honorable Michael H. Simon, signed an order (19-MC-243-E) authorizing the lawful roving intercepts, including voice and electronic communications, of TT18 and the various and changing phones used by QUIROZ. During the first several days of intercepts, Investigators have continued to intercept QUIROZ direct drug couriers, such as CRUZ, SALAZAR, CORADO, GALLEGOS, and MARKS deliver large quantities of drugs to various customers in the Portland, OR area. After selling the drugs, QUIROZ then has the drug cash delivered to

GONZALEZ at GONZALEZ BROS. Investigators have also intercepted MICHOCANO and others supplying large quantities of suspected crystal methamphetamine and/or heroin to the MONROY DTO for further distribution. The MONROY DTO also utilizes various interstate drug couriers, such as SANDOVAL, to transport drugs from outside the District of Oregon to the District of Oregon. Based on these intercepts and subsequent drug seizures, including thousands of phone calls using coded jargon to distribute controlled substances, I have become familiar with code words used to describe their drug trafficking activity.

***Investigators identify SANDOVAL aka "Jenny" as Interstate Drug Courier***

20. Between July 23, 2019, and July 24, 2019, Jesus GONZALEZ, using TT16, coordinated the delivery of a load of suspected methamphetamine from California to the District of Oregon. Specifically, Jesus GONZALEZ was intercepted communicating, by voice and text, with POLI, QUIROZ, and FERNANDEZ about the delivery of two "whole ones," or suspected kilograms of methamphetamine, to CRUZ from SANDOVAL. Investigators believe that SANDOVAL transported the methamphetamine from California to the District of Oregon and was doing so at the direction of MONROY. Investigators surveilled SANDOVAL after it was believed she delivered the drugs to CRUZ. SANDOVAL was identified to be staying at a hotel in the greater Portland, OR area. According to hotel records, SANDOVAL provided the **TC** as her phone number. After the drugs were delivered to CRUZ, Investigators stopped SANDOVAL and seized approximately $11,000 in drug cash hidden in a Ziploc bag box in their car. SANDOVAL was released without incident. After SANDOVAL was released, Investigators intercepted numerous calls between QUIROZ and Jesus GONZALEZ discussing the seizure of the drug cash. These calls also confirmed that all the drugs transported by SANDOVAL, aka "Jenny," were delivered to CRUZ.

21. On August 9, 2019, at approximately 8:06 p.m., QUIROZ, using TT18, called SANDOVAL, using the **TC**. The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call and among other things, QUIROZ asked SANDOVAL if she was "ready to work?" SANDOVAL asked "for what and when?" QUIROZ asked SANDOVAL if she had any "communication with Gordo," to which SANDOVAL said "no." QUIROZ said that the "main guys from Nayarit would talk to [her] first, the main guys," to which SANDOVAL said "okay." QUIROZ told SANDOVAL that he would give "them [her] number and that [he] already recommended her well." QUIROZ told SANDOVAL that he "needed [her] to get ready to go to Los Angeles to pick up from there, but first they needed to speak with [her] first," to which SANDOVAL said "okay." QUIROZ told SANDOVAL to "just say Pariente when they called [her]." Session #TT18-2-1938

22. Based on this call, I believe that QUIROZ and SANDOVAL discussed the transportation of a large cache of drugs from Los Angeles, CA to Portland, OR. Specifically, QUIROZ asked SANDOVAL if she was ready to transport drugs. SANDOVAL asked where and when the drugs need to be transported from. QUIROZ asked SANDOVAL if she had received a call from "Gordo," a nickname for POLI; who is a drug source for methamphetamine in Mexico. QUIROZ said that the drug bosses in Nayarit, Mexico would give me a call on the **TC** first, to which SANDOVAL acknowledged. QUIROZ told SANDOVAL that he would give the drug bosses her cell phone number, that being the **TC**, and that he already told the drug bosses that she is a reliable drug transporter. QUIROZ told SANDOVAL that he needed her to travel to Los Angeles, CA to pick up a drug load to transport to Portland, OR but first the drug bosses in Mexico needed to talk to her on the TC. QUIROZ told SANDOVAL to just say the code word "Pariente," or a nickname for DIAZ, when they call her to discuss the drug shipment.

23. Based off the above facts, including Court authorized intercepted conversations relating to drug trafficking and my knowledge of this investigation and SANDOVAL was already stopped with approximately $11,000 in drug cash, I believe that there is probable cause to believe that the **Target Cell Phone** is being used to coordinate the delivery of large quantities of drugs in violation of Title 21, United States Code Sections 841(a)(1), 843(b), and 846. I also have probable cause to believe that the location information of the **Target Cell Phone** described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

24. In my training and experience, I have learned that Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

25. Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Provider's network or with such other reference points as may be reasonably available.

26. Based on my training and experience, I know that Provider can collect cell-site data about the **Target Cell Phone**.

## Conclusion

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

28. I further request that the Court direct Provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Provider. I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

29. Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney Scott Kerin. I was informed that it is AUSA Kerin's opinion that the affidavit and

application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

**Request for Delaying Notice**

30. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until December 31, 2019 after the collection authorized by the warrant has been completed as this is an ongoing complex wiretap investigation. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Based upon my knowledge, training, and experience, it is my belief that providing immediate notice to subscribers or users of the **Target Cell Phone** may result in the endangerment of the life or physical safety of an individual, flight from prosecution, the destruction of or tampering with evidence, intimidation of potential witnesses, and/or otherwise seriously jeopardize an investigation. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

///

///

///

**Request for Sealing**

31. I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may endanger the life or physical safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation. Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

By Telephone
Clinton Lindsly
Special Agent
Homeland Security Investigations

~~Subscribed and~~ sworn to before me this 11 day of August 2019.

John Jelderks
Honorable John Jelderks
United States Magistrate Judge